# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | | |
|---|---|---|
| IGUANA, LLC., | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civil Action No.** |
| | : | **7:08-CV-141 (HL)** |
| PATRIOT PERFORMANCE | : | |
| MATERIALS, INC., | : | |
| | : | |
| **Defendant.** | : | |

_____

## ORDER

This case is before the Court on Defendant Patriot Performance Materials, Inc.'s ("Patriot") Motion for Summary Judgment (Doc. 14). For the following reasons, the motion is granted in part and denied in part. Summary judgment is granted to Patriot on Iguana's breach of contract claim and on all issues in Patriot's counterclaim, except the issue on the amount of damages.

The case boils down to a breach of contract dispute. Plaintiff Iguana, L.L.C. ("Iguana") entered into contracts with the United States to supply the United States military with pop-up tents, called bed nets. (Compl.¶ 8). Iguana then entered into an agreement with Patriot whereby Patriot agreed to perform the cut and sew operations to manufacture the bed nets. (Compl. ¶ 14). Iguana claims that Patriot failed to perform under their agreement. (Compl. ¶¶ 32-36). As a result, Iguana could not meet its obligations under its contracts with the United States military. Iguana claims damages. Patriot, in turn, claims in its counterclaim that Iguana failed

to perform under their agreement causing Patriot to suffer damages.

## I.     PROCEDURAL HISTORY

As a preliminary matter, the parties have contested whether Patriot's counterclaim is properly before the court.   To resolve that issue the Court must first explain in detail the procedural history of the case.  Later in the order the Court provides the factual background of the case.

Iguana's complaint was originally filed in the Superior Court of Thomas County on June 16, 2008.  Patriot removed the case to this Court two weeks after the complaint was filed.  See Iguana, LLC v. Patriot Performance Materials, Inc., case no. 7:08-cv-85 (HL).  Two weeks after removing the case, Patriot filed in this Court an answer and a counterclaim asserting a breach of contract claim against Iguana. (Doc. 6 in case no. 7:08-cv-85).   Iguana was served with the answer and counterclaim.  (Iguana Res. Br. at 2).  The answer and counterclaim were timely under the Federal Rules of Civil Procedure.

Patriot's breach of contract counterclaim asserted that Patriot suffered damages because Iguana did not pay Patriot for the bed nets it delivered to Iguana and did not pay Patriot for the profits Patriot would have obtained had Iguana not cancelled the contract.

On July 30, 2008, the case was remanded to the superior court when Patriot failed to show that the citizenship requirements for diversity jurisdiction had been satisfied. (Doc. 9 in case no. 7:08-cv-85).

On July 30, 2008, Patriot sent Iguana a copy of the notice of remand and the counterclaim, titled Amended Counterclaim. (Preston Aff. ¶ 5, Ex. 1 to reply brief).[1] On July 31, 2008, Patriot filed a notice of remand in the superior court. (Notice of Removal Ex. J). Included with the notice was the answer and counterclaim. (Id.).

On November 4, 2008, Patriot removed the case for the second time to this Court. The requirements for diversity jurisdiction were satisfied.

## II. WHETHER PATRIOT'S COUNTERCLAIM IS PROPERLY BEFORE THE COURT

Patriot has moved for summary judgment on its counterclaim. Iguana asserts summary judgment on the counterclaim is improper because: (1) the counterclaim was filed out of time making the counterclaim invalid; and (2) alternatively, if it was timely filed, Iguana was not served with the counterclaim.

### A. Out of Time Counterclaim

In Iguana's view, the counterclaim was filed out of time because Patriot did not ask the superior court for leave to file the counterclaim after the case was remanded.

Iguana contends that the counterclaim was terminated when the district court remanded the case back to superior court. Because the time to file a counterclaim had expired in the superior court, Patriot should have asked leave from the superior court to file an out of time counterclaim. Patriot did not obtain leave from the superior court to file its counterclaim; thus, according to Iguana the counterclaim is

---

[1] Edward Preston is the attorney for Patriot.

invalid.

Patriot has cited <u>Teamsters v. Road Builder</u>, 249 Ga. 418, 219 S.E.2d 698 (1982) (overruled on other grounds), for the proposition that its counterclaim remained viable after remand, rendering the need to ask for leave to file the counterclaim in superior court unnecessary. In <u>Teamsters</u>, the Supreme Court of Georgia held that a defendant need not file an answer in superior court after remand to avoid default if the answer is timely filed in district court following removal. <u>Id.</u> at 701. The court noted that courts "abhor forfeiture and favor adjudication of litigation on the merits." <u>Id.</u> (citation omitted). The plaintiff was on notice that the defendant had contested liability in federal court. <u>Id.</u> The court held that repleading is necessary only if the superior court requires it. Quoting another case, the court reasoned:

> Under federal practice, a removed case proceeds according to the Federal Rules of Civil Procedure and is treated as though it had been commenced originally in the federal court. [Cits.]. Repleading according to the federal rules is generally not required unless there is a substantial difference between the state and federal practice. [Cits.] Where, as here, a pleading ... has been timely filed, logic, reasoning and comity all support the conclusion that a similar rule should be applied by the Georgia courts upon remand. Since the Georgia Civil Practice Act and the Federal Rules of Civil Procedure are similar in most respects, the instances in which repleading would be required would be few, and such requirement should be upon directive of the trial court.

<u>Id.</u> at 700-01.

Here, the superior court did not set aside Patriot's counterclaim or direct Patriot to replead its counterclaim. Further, Iguana was on notice that Patriot had asserted a counterclaim because the counterclaim was timely filed and properly

served on Iguana in federal court. Therefore, according to Georgia law, the counterclaim existed in the superior court after the district court remanded the case. Repleading, or asking for leave to file an out of time counterclaim, was not necessary.

### B. Service of the Counterclaim

Iguana alternatively asserts that Patriot's counterclaim is not properly before this Court because Iguana was not properly served with the counterclaim after the case was remanded. The resolution of whether Patriot properly served its counterclaim on Iguana depends on the resolution of a separate issue: whether Patriot was required to reserve Iguana with the counterclaim after the district court remanded the case. If Patriot was not required to reserve the counterclaim after remand, then it cannot be held liable for any defective service of the counterclaim.

As has been explained, following an order of remand, a defendant is not required to replead in superior court the pleadings it made in federal court unless directed otherwise by the superior court. Since a defendant is not required to replead in superior court following remand, then the defendant is not required to reserve the pleadings on the plaintiff following remand.

Supporting this conclusion is the federal statute governing the procedure after removal. The statute contemplates that cases in state court will resume not by action of the parties, but on action by the district court informing the state court that the case has been remanded. 28 U.S.C. § 1447(c) ("A certified copy of the order of

remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.")

Here, it is undisputed that the superior court received notice of remand and that the superior court properly proceeded with the case following remand. Because repleading and reserving the pleadings after remand was not necessary, the Court need not reach the question of whether Iguana was properly served with the counterclaim following remand.

Accordingly, Iguana's arguments that Patriot's counterclaim is not properly before this Court fail. The counterclaim is a claim ripe for summary judgment ruling. The Court will now resolve other procedural issues raised by the parties before reaching the merits of Patriot's summary judgment motion.

## III.    TIMELINESS OF THE SUMMARY JUDGMENT MOTION

Iguana contends that the Court should not rule on Patriot's summary judgment motion because it was filed late.

The dispositive motions deadline set forth in the Court's scheduling and discovery order was August 18, 2009. The dispositive motions deadline was not extended along with the discovery deadline when the Court granted the parties discovery extension motion on July 1, 2009. Patriot's motion for summary judgment was filed on November 16, 2009, three months late.

The Court agrees that Patriot's motion for summary judgment is technically untimely. Nevertheless, it is within the Court's discretion to consider untimely filed

motions. See Fed. R. Civ. P. 6(b)(1) (explaining that on good cause the court may extend the time to act because of excusable neglect). In exercising its discretion, the Court weighs the value of reaching the merits of the case and the reason for the delay against the potential prejudice to a party. In this case, the Court believes that considering the motion for summary judgment is proper. Patriot's failure to file the motion is excusable because the Court's order extending the discovery deadline can be reasonably construed to also extend the deadline for filing dispositive motions. Moreover, as is explained further below in this order, granting summary judgment is warranted on the merits as to all issues, minus the issue of how much Patriot is owed in damages. It makes little sense to deny summary judgment on the basis that the motion is untimely when doing so will result in a trial with potential significant costs to both parties and when the results of the trial are likely to be in favor of Patriot.[2] It is likely that Iguana would suffer prejudice–additional costs without a likelihood of success–in the event that the case goes to trial.

The Court will rule on the summary judgment motion.

## IV. IGUANA'S UNTIMELY ANSWERS TO REQUEST FOR ADMISSIONS

The last procedural hurdle the Court must overcome before reaching the merits of Patriot's summary judgment motion is deciding whether the Court will consider the matters in Patriot's requests for admissions admitted.

---

[2] This assumes that the evidence at trial would be the same evidence presented to the Court on summary judgment.

Iguana failed to answer Patriot's request for admissions within thirty days as required by Federal Rule of Civil Procedure Rule 36. Rule 36(a)(3) deems matters requested in the requests for admissions admitted if a party fails to file answers within thirty days.

If a matter is admitted under Rule 36 it is "conclusively established." Fed. R. Civ. P. 36(b). A party may obtain relief from the application of this rule by filing a motion to withdraw the admissions. Id. The standard for permitting withdrawal is whether the withdrawal "would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Id.

Iguana asks the Court not to deem the matters in Patriot's request for admissions admitted because Patriot never brought a motion for discovery sanctions against Iguana. Iguana states that there were delays on the parts of both counsel, but "each of the parties responded to requests by the other in a manner consistent with satisfying the expressed needs of the other."

Patriot points out that Iguana never served any formal discovery on Patriot and that Patriot responded within one week's time to Igauna's sole informal discovery request. Patriot argues that it would be prejudiced if the Court permitted the withdrawal of the admissions because Patriot did not conduct discovery on the matters that Iguana admitted.

Based on the evidence, Iguana does seem to be at fault for not conducting

discovery properly, but it is clear that permitting withdrawal of the matters admitted by Iguana would promote the presentation of the merits of the case. Moreover, after reviewing the record, the Court has determined that granting summary judgment in favor of Patriot, except as to damages, is appropriate even if the matters are not admitted. Further, although Patriot may suffer some prejudice because a jury might conclude that the amount of damages Patriot is owed is less than the amount Iguana admitted in Patriot's Request for Admissions,[3] the possible prejudice is outweighed by the value of deciding cases on the merits. Finally, the Court finds that the record shows that Patriot was able to conduct discovery on the issue of its damages, but to be fair, it is willing to consider a motion to conduct discovery on the sole issue of damages.

Accordingly, the Court deems the matters in Patriot's requests for admissions not admitted.

## V.  SUMMARY JUDGMENT ANALYSIS

### A.  Facts[4]

In October 2007, Iguana won three contracts from the United States military

---

[3] Iguana admitted in the Request for Admissions that the total profit per bed net was $20.

[4] Although Iguana failed to attach to its response a separate and concise statement of material facts, numbered separately, as required by this District's Local Rules, the Court does not find the facts in Patriot's statement of facts admitted. Instead, the Court has reviewed the record to determine whether there any facts in dispute. The Court views the facts in the light most favorable to Iguana, the nonmoving party.

to supply the military with bed nets. (SOMF ¶ 4).[5]  The contracts required Iguana to produce the first 3,000 bed nets by November 11, 2007.  (SOMF ¶ 5).  On October 22, 2007, Iguana requested a three-month extension of time from the military to provide the first 3,000 bed nets.  The military granted Iguana's request and extended the deadline to February 29, 2008. (SOMF ¶ 6).

On November 5, 2007, Iguana issued a purchase order No. 7K-2007 to Patriot where Iguana ordered 3,560 bed nets from Patriot.  (Compl. Ex. 2).  The parties agreed that Patriot would perform the "cut and sew" operations needed to manufacture the bed nets and Iguana would pay for all materials needed to manufacture the bed nets. (Compl. ¶ ¶ 14, 20).[6]  The purchase order noted that the final cost of the bed nets was to be determined, but the profits would be shared "50/50" between Iguana and Patriot.  (Compl. Ex. 2).  The profit was the amount left over after costs (material and labor) had been subtracted from the price the military paid for each bed net. (Stewart Dep. at 153, Def. SOMF Ex. 3).[7]  The purchase order did not specify a date by which Patriot was to deliver the bed nets to Iguana.

On November 8, 2007, Iguana and Patriot met to discuss the terms of the

---

[5] "SOMF" refers to Patriot's statement of material facts.  The cited facts are those admitted by Iguana in its response brief.

[6] The Court cites to paragraphs in the complaint that Patriot agrees are facts not in dispute in its statement of material facts.

[7] The Court's cites first to the deposition, affidavit, or interrogatory and then to the exhibit number in which the deposition, affidavit, or interrogatory is found.  For all other evidence the Court cites to the exhibit number.

purchase order.  A meeting details sheet listed the costs of the materials for the bed nets to be $93,402.60.  (Compl. Ex. 3).  The meeting details sheet does not list delivery dates, but it states that the parties discussed the costs, and details about the manufacturing and delivery of the bed nets.  (Id.).

On November 27, 2007, Iguana added 4,915 bed nets to the purchase order making 8,475 as the total number of bed nets ordered by Iguana from Patriot. (Compl. Ex. 5).  Patriot's Vice-President, William Christopher Powell ("Powell"), averred that  eventually Iguana ordered an additional 47,437 bed nets from Patriot. (Powell Aff. ¶ 13, Def. SOMF Ex. 9).

In January 2008, Patriot received a copy of a letter addressed to  Ernie Stewart ("Stewart"), President of Iguana.  (Powell Dep. at 96, Def. SOMF Ex. 5). The letter accused Iguana of infringing a bed net patent and demanded that production of the bed nets cease. (Id. at 96).  Patriot forwarded the letter to Stewart. (Id. at 96-97).  Patriot stopped producing bed nets until late January when Iguana promised to indemnify Patriot for claims of patent infringement arising out of Patriot's production of bed nets under its contract with Iguana.  (Id.; Powell Aff. ¶ 5;  Def. SOMF Ex. 6).

Patriot laid off 40 of its employees during the time that bed net production ceased because the employees had been hired to specifically to cut and sew the bed nets.  (Powell Aff. ¶ 5; Def. SOMF Ex. 7).  Once production started again Patriot rehired the employees.  (Powell Aff. ¶ 5).

On January 30, 2008, Iguana shipped 692 bed nets to the military, but requested that it be allowed until March 30, 2008 to provide the remaining bed nets. (Def. SOMF Ex. 8).[8]  Iguana explained to the military that someone had been sending its suppliers letters claiming patent infringement.  (Id.).

In February 2008, Patriot completed fifty bed nets according to the specifications Iguana provided it.  (Stewart Dep. at 102, 165, Def. SOMF Ex. 3) Iguana then furnished the bed nets to the military mistakenly believing that the bed nets met the military's specifications.  (Stewart Dep. at 102, Def. SOMF Ex. 3 ).  Two weeks after Iguana shipped the bed nets, the military told Iguana that the bed nets were two inches short.  (Id. at 102, 107).  The military accepted the fifty bed nets, however, because it had an urgent demand for them.  (Id. at 102).

Iguana then sent Patriot a new pattern that was supposed to match the bed net specifications in the military contract.  (Powell Aff. ¶ 8).  Patriot determined that the new pattern could not be used.  (Id.).  It immediately notified Iguana of the problem.  (Id.).  Iguana then asked Patriot to create a pattern.  (Id.).  Patriot sent its pattern to Iguana in early March 2008 for approval.  (Id.). Iguana approved the new pattern on March 28, 2008.  (Def. SOMF Ex. 7).

On May 7, 2008, Iguana requested another extension from the United States to meet its deadlines under its contracts.  As part of its request, Iguana explained

---

[8] The record is unclear as to whether the 692 bed nets or some portion of the bed nets Iguana provided to the military were Patriot's bed nets.

that the patent infringement letters sent to its suppliers created an enormous problem for Iguana. (Def. SOMF Ex. 10).

Between March 28, 2008, and May 14, 2008, Patriot produced and delivered 563 bed nets to Iguana. (Powell Aff. ¶ 10). On May 14, 2008, however, Iguana cancelled its contract with Patriot. (Id.). Iguana contends that Patriot breached the contract because Patriot failed to meet shipping commitments and did not supply bed nets that complied with its military contracts. (Interrogatory ¶ 14, Def. SOMF Ex. 12). Iguana claims breach of contract damages arising from: (1) penalties of $12,516.57 from the military for late deliveries on its contracts with the military; and (2) a military contract bid Iguana lost in September 2008, valued at $31,381,473.60.[9] (Id. at ¶ 11).

Iguana's complaint contains four counts, which are: (1) Replevin;[10] (2)

_____

[9] It also claims damages for its missing property. The Court believes those claimed damages are part of its replevin claim, not its breach of contract claim. Regardless of their classification, summary judgment is granted to Patriot on Iguana's breach of contract claim, rendering the need to decide the issue of Iguana's damages moot.

[10] Iguana believes that it has not received all of its property from Patriot. (Interrogatory ¶ 9, Def. SOMF Ex. 12). The property it claims it is entitled to is property that it sent to Patriot or paid to Patriot as part of their contract.

The property Iguana received from Patriot C.O.D. had the following problems:
1. Missing from delivery was 7,418 yards of Duro Mesh valued at $3.75/yard, totaling $27,815.50.
2. Mesh that did not meet specifications, $55,192.50
3. Rip Stop (not useable or not returned) 14,838.45 yards @ $4.25/yard, totaling $59,353.80.

13

Enforcement of Settlement; (3) Breach of Contract; and (4) Pursuant to Ga. Stat. §

13-6-11, Litigation Expenses.  Patriot has moved for summary judgment on Count

3, Iguana's breach of contract claim.  It has not moved for summary judgment on

Iguana's replevin claim.

### B.    Summary Judgment Standard

Summary judgment must be granted if "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material facts and that the movant is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(c).  In ruling on a defendant's motion for summary judgment,

the court takes the facts in the light most favorable to the plaintiff.  <u>Stanley v. City of</u>

<u>Dalton</u>, 219 F.3d 1280, 1287 (11th Cir. 2000).  The court may not, however, make

credibility determinations or weigh the evidence.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden lies on the movant to demonstrate that the nonmovant lacks

evidence to support an essential element of its claim.  <u>Lowe v. Aldridge</u>, 958 F.2d

1565, 1569 (11th Cir. 1992).  The burden then shifts to the nonmovant, who must

come forward with some evidence that would allow a jury to find in his favor, even

---

Iguana also alleges that Patriot agreed to ship the materials, but instead it
shipped the materials C.O.D.

(Interrogatory ¶ 11, Def. SOMF Ex. 12 ).

if the parties dispute that evidence.  Id.  If the evidence that the nonmovant presents,

however, is "not significantly probative" or "merely colorable," then summary

judgment may be granted.  Liberty Lobby, 477 U.S. at 249.

## C.    Whether There are Genuine Issues of Fact in Iguana's Breach of Contract Claim

The Court applies North Carolina substantive law to determine whether

summary judgment should be granted to Patriot on Iguana's breach of contract

claim.[11]  North Carolina law provides that a breach of contract claim exists if: (1)

there is a valid contract; and (2) a breach of the contract terms.  Poor v. Hill, 530

S.E.2d 838, 843 (N.C. Ct. App. 2000).[12]

According to Iguana, Patriot breached the parties' contract because Patriot

_____

[11] Because this is a diversity case, state substantive law will apply. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). To determine which state's substantive law will apply, courts use the choice of law rules of the forum state, which in this case is Georgia. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 491 (1941). In determining which state's law applies in contracts cases, Georgia courts follow the doctrine of lex loci contractus, which provides that contracts " 'are to be governed as to their nature, validity, and interpretation by the law of the place where they were made, except where it appears from the contract itself that it is to be performed in a State other than that in which it was made, in which case ... the laws of that sister State will be applied.' " Convergys Corp. v. Keener, 276 Ga. 808, 811 n. 1 & 812, 582 S.E.2d 84, 86 n. 1 & 87 (quoting General Tel. Co. of Se. v. Trimm, 252 Ga. 95, 95, 311 S.E.2d 460, 461 (1984)).  Here, Patriot contends that the contract was entered into in North Carolina.  There is no evidence that the agreements were to be performed outside North Carolina.  Iguana has not disputed that North Carolina is applicable law to be applied.  Thus, the Court applies North Carolina substantive law.

[12] Because the parties' contract was for the sale of goods, the Uniform Commerical Code ("UCC") provisions, as adopted by the North Carolina legislature, govern.  The parties have not claimed violations of any of the code's provisions. Therefore, the court does not apply the UCC provisions to determine whether summary judgment is appropriate on the parties' breach of contract claims.

delivered "a total of only 563 of the 8,475 bednets which it was to deliver, and even those bednets were delivered well after the delivery dates required by Contracts 1-3." (Compl. ¶ 36). Patriot contends that it performed under the contract. Alternatively, it asserts that even if Patriot breached the contract, Iguana cannot prove that its claimed damages were caused by Patriot's breach. The Court grants summary judgment to Patriot on Iguana's breach of contract claim because the record evidence only shows that Patriot performed under the contract.

As for Iguana's assertion that Patriot delivered 563 bed nets after the delivery dates set forth in Iguana's contract with the military, there is nothing in the purchase order, nor has Iguana pointed to any evidence, showing that Patriot was required to deliver any portion of the ordered bed nets by a certain time to Iguana. Iguana has only alleged in its complaint that "[t]he deliveries of bednets by Patriot were to be in compliance with Contracts 1-3 which Iguana had with the U.S. military." (Compl. ¶ 33). Because this case is on summary judgment, mere allegations are insufficient. Iguana must point to evidence in the record supporting its allegation that there were specified delivery dates in its contract with Patriot.

The Court cannot find any term in the purchase order or record evidence supporting the existence of a delivery date; thus, without a contract term setting out a delivery date for the 563 bed nets, Patriot's delivery of the bed nets between March 28 and May 14, 2008, cannot constitute a breach of the parties' contract terms. Also, although Patriot did not provide 8,475 bed nets to Iguana, Iguana

cancelled its contract with Patriot while the contract was still in force. Without any evidence that 8,475 bed nets were due prior to the date of cancellation, Iguana cannot assert a breach of contract against Patriot for failing to deliver 8,475 bed nets.

Finally, the two instances of Patriot's delay in manufacturing the bed nets do not create genuine issues of fact as to whether Patriot breached the parties' contract. The first delay occurred in January 2008. For two weeks Patriot stopped production of the bed nets because the parties were discussing what action to take on the patent infringement letter. This delay cannot constitute a breach of contract unless Iguana shows that the parties' contract required Patriot to deliver the bed nets by a certain date and that Patriot failed to meet the agreed delivery deadline. As the Court has already explained, Iguana has failed to produce any evidence showing the Court that Patriot was deliver the bed nets by an agreed delivery date.

The second delay occurred between February and the end of March 2008. Iguana provided Patriot the wrong pattern specifications for the bed nets, the military found the bed nets to be nonconforming, and then Iguana failed to provide Patriot a correct pattern. On March 28, 2008, after at least a month of no bed net production, Patriot began manufacturing the bed nets using the new pattern it created and Iguana approved.

Again, there is no evidence in the record setting forth the dates by which Patriot was to deliver the bed nets to Iguana. Any delay in delivery cannot therefore

constitute a breach of the parties' contract.  Even if there was a delivery date that Patriot failed to meet,  the evidence in the record leads to only one conclusion: that Iguana caused the delay because it sent Patriot incorrect specifications for the bed net pattern.   As a general rule, if a party causes the other party to delay in performance, the party causing the delay cannot assert a breach of contract claim.

 17A Am. Jur. 2d <u>Contracts</u> § 610  ("Delay in performance of a contract will, as a rule, be excused where it is caused by the party who objects to or seeks damages for the delay.  A person who fails to complete a contract in time because of the act or fault of the other party is therefore not liable for the delay.").

Summary judgment is accordingly granted to Patriot on Iguana's breach of contract claim since Iguana has not shown that Patriot's deliveries constituted a breach of the parties' contract terms.

### D.    Whether There are Genuine Issues of Fact in Patriot's Counterclaim

Patriot has asserted a counterclaim against Iguana that contains two counts: (1) breach of contract; and (2) unjust enrichment.  Patriot has moved for summary judgment on its breach of contract claim.

From what the Court can discern from Iguana's response brief, Iguana opposes summary judgment on Patriot's counterclaim on the basis that Iguana was justified in cancelling the contract because of Patriot's breach. North Carolina law provides that "[i]f either party commits a material breach of the contract, the other

party should be excused from the obligation to further perform." Millis Const. Co. v. Fairfield Sapphire Valley, Inc., 358 S.E.2d 566, 570 (N.C. Ct. App. 1987) (citation omitted).

As the Court has already established, the record undisputedly shows that Patriot did not commit a breach of the parties' contract. Iguana, therefore, was not excused from performing under the contract. Iguana's cancellation of the contract constituted a breach of the parties' agreement.

Patriot next argues that there is no issue of fact as to the amount of damages it is entitled to receive because of Iguana's breach. Patriot claims two sets of damages: (1) $64,960.44 arising from Iguana's failure to pay for the 563 bed nets Iguana accepted from Patriot. For these bed nets, Patriot asserts it is owed its labor costs plus 50% of Iguana's profit from each bed net (about $10); and (2) $474,370 in lost profits from the remaining 47, 437 bed nets Patriot would have delivered to Iguana had Iguana not cancelled the contract. (Powell Aff. ¶ 13).

In its response brief, Iguana does not argue that Patriot is not entitled to labor costs and it does not dispute the amount of the labor costs incorporated in the claimed damages for the 563 delivered bed nets. It also does not dispute Patriot's evidence that Iguana ordered 47,437 bed nets from Patriot. The Court accordingly assumes for summary judgment purposes that there are no disputes of fact as to the labor costs or the number of bed nets ordered under the contract.

The only disputed fact between the parties is Patriot's claimed $10 profit for

each bed net.  Under North Carolina law, lost profits are only recoverable "when it is made to appear (1) that it is reasonably certain that such profits would have been realized except for the breach of the contract, (2) that such profits can be ascertained and measured with reasonable certainty, and (3) that such profits  may be reasonably supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of the breach." <u>Keith v. Day</u>, 343 S.E.2d 562, 568-69 (N.C. Ct. App.1986) (citation omitted).

Patriot presented evidence, which Iguana does not dispute, that the parties intended to receive profits from the sale of bed nets to the military and that the profits would be split "50/50" between them.   Thus, on summary judgment there is no dispute as to the third factor, whether it is reasonably certain that the lost profits were within the contemplation of the parties.

As for the first and second factors, whether lost profits would have been realized except for Iguana's breach and if so whether the lost profit amount was reasonably certain,  Iguana argues that it had not yet received any profits from its contracts with the military and that the $10 bed net profit is speculative.  It points out that the profits from the bed nets had yet to be computed because no bed nets made by Patriot had been delivered to the military.[13]  According to Iguana, "a split of zero

---

[13] There is no evidence in the record from either party establishing that the military had paid Iguana for Patriot's bed nets.  Thus, the Court agrees with Iguana that no profits had been computed.  The Court disagrees that Iguana had not delivered any of Patriot's bed nets to the military.  The record establishes that Iguana delivered 50 Patriot bed nets to the military.  The military accepted the bed nets despite them being

still amounts to only zero." (Iguana Res. Br.at 6). It also points to Powell's testimony where Powell admitted that the occurrence of possible events such as "shrinkage" and employee intervention could affect the profit.

Iguana has presented no evidence that the 563 bed nets Patriot delivered to Iguana were improperly made such that the military would not accept the bed nets or pay Iguana the contract price. Further, Iguana has not presented any evidence that the military would not have accepted the bed nets made by Patriot or paid the contract price if Iguana had not cancelled the contract. The Court concludes that Patriot has shown it is reasonably certain that Iguana would have received payment from the military for the 563 bed nets. The payment would have included a profit that would have been split equally between the parties. Thus, on summary judgment, Patriot has satisfied the first factor: it is reasonably certain that lost profits would have been realized had Iguana not breached the contract.

As for whether the amount of claimed lost profits is too speculative, North Carolina law provides that "lost profits will not be awarded based upon hypothetical or speculative forecasts of losses. Iron Steamer, Ltd. v. Trinity Rest., Inc., 431 S.E.2d 767, 770 (N.C. Ct. App.1993); Catoe v. Helms Constr., & Concrete Co., 372 S.E.2d 331, 335 (N.C. Ct. App.1988) (plaintiff's testimony providing an estimate of anticipated profits is not enough of a factual basis for the issue to reach a jury).

Stewart testified that the amount of profits Iguana would receive per bed net

---

too short due to Iguana's failure to provide the correct specifications to Patriot.

from its contracts with the military would be about $20. (Stewart Dep. at 142, Def. SOMF Ex. 3, ).[14]  The purchase order between Iguana and Patriot stated that the profits were to be split "50/50."  If Iguana received a $20 profit on the bed nets it delivered to the military, then Patriot was to receive $10.  Powell testified that the estimated profit was the result of a joint initial analysis between Iguana and Patriot. (Powell Dep. at 81, Iguana Ex. 1).

It is highly persuasive to the Court that Iguana, through Stewart, admitted that the total profit would be about $20 per bed net.   (Stewart Dep. at 142, Def. SOMF Ex. 3).  The $20 profit was based on the information the parties had at the time they entered into their contract, including the cost of the materials to make the bed nets and their anticipated labor costs.  (Powell Dep. at 84, Igana Ex. 1). Admittedly, $20 was a projected number, but the law does not require that there be an a realization of profits before lost profits can be awarded.  See McNamara v. Wilmington Mall Realty Corp., 466 S.E.2d 324, 330 (N.C. Ct. App. 1996) (explaining that the North Carolina Supreme Court refused to adopt a rule preluding an award of damages for lost profits where the damaged party had no recent record of profitability).

The Court finds that Iguana has failed to create a genuine issue of fact as to whether $20 in profit per bed net (or $10 profit for Patriot) is too speculative.  At the same time, however, Patriot's sole evidence on the amount of lost profits per bed net

_____

[14] Profits were the amount left after cost for materials and labor was deducted.  (Stewart Dep. at 153, Def. SOMF Ex. 3).

is an estimation. There is a jury question as to whether Patriot's share of lost profits per bed net is in fact $10. Summary judgment is only proper when there is no dispute of fact as to the exact amount of damages owed. Accordingly, the Court denies Patriot summary judgment on the issue of the amount of damages it is entitled to receive because of Iguana's breach. Summary judgment is granted to Patriot on all other issues in Patriot's counterclaim.

## VI. CONCLUSION

Patriot's motion for summary judgment (Doc. 14) is granted in part and denied in part. The Court grants Patriot's motion for summary judgment on Iguana's breach of contract claim. Patriot's motion for summary judgment on its counterclaim is granted on all issues except the amount of damages. The issue of damages will be tried during the October term of court in Valdosta, which is scheduled to begin on October 18, 2010.[15]

**SO ORDERED**, this the 15th day of September, 2010.

*s/   Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

lmc

---

[15] If the Court grants a motion to conduct discovery on the issue of damages, then the Court will also be willing to consider a motion to continue the trial.